## NEW MEXICO v. TEXAS.

### IN EQUITY.

No. 2, Original, Argued December 2, 1924.—Decided December 5, 1927.

1. A copy of memoranda and field notes of a survey of part of the boundary between Mexico and Texas, made in 1852 by a Mexican engineer by order of the Mexican Member of the Joint Boundary Commission, under the Treaty of Guadalupe-Hidalgo, was admissible in evidence upon authentication by the Mexican Boundary Commissioner having custody of the original. P. 296.

2. A motion, by the party who produced it, to strike out an authenticated copy, accompanied by evidence adduced to prove that the party had been mistaken in believing that there was any original in the place from which the authentication was made, comes too late, when deferred until the day when the taking of testimony is closed by mutual agreement, two years after the copy was introduced by the opposite party and treated by both sides as evidence in the case. P. 297.

3. The New Mexico-Texas boundary, in the area involved in this suit, is the middle of the main channel of the Rio Grande, as that river

. flowed in 1850, extending southwardly from the 32d parallel of North Latitude to the parallel of 31 degrees, 47 minutes in the course and location found and described in Section V (1) of the report of the Special Master in this case; the intersection of the east bank of the river with the 32d parallel is to be taken at a point 600 feet west from Monument No. 1 of Clark's Survey on that parallel made in and after 1859 in locating the Texas-United States boundary, as said monument No. 1 was reëstablished by Joint Commissioners of the United States and Texas, appointed pursuant to a Joint Resolution of Congress passed in February, 1911; and the middle line of the channel is to be taken 150 feet from the east and west banks of the river respectively, as found by the Special Master. P. 303.

· In arriving at this conclusion, the Court finds and decides as follows:

4. That the testimony of ancient witnesses called by New Mexico, as to their recollection of the old river, is far from satisfactory, and does not, in view of the other evidence, sustain the burden resting on New Mexico of proving her claim that the location was farther east than the one claimed by Texas and found in this case. P. 300.

5. That the greater weight of the evidence shows that Clark's Monument No. 1 did not coincide with his Station 1, but was located at least 2783 feet west thereof, substantially as reëstablished by the Joint Commission of the United States and Texas above mentioned. P. 300.

6. That under the Joint Resolutions of February and August, 1911, preceding and conditioning the admission of New Mexico as a State, she is bound by the reëstablishment of the Monument by the Commission and cannot question its accuracy. *Id.*

7. That this necessarily extends the Clark boundary line along the 32d parallel to the east bank of the river, at a point 600 feet west of the reëstablished Monument. *Id.*

8. That according to the greater weight of the evidence, the river, in 1850, ran, as shown by certain surveys, patents and maps relied on by Texas, on the course and in the location set forth and described in the Special Master's report. *Id.*

9. That this conclusion is reinforced by the tacit and long-continued acquiescence of the United States, while New Mexico was a Territory, in the claims of those holding the land in controversy under Texas surveys and patents, and the undisturbed possession of the Texas claimants. *Id.*

10. New Mexico, having explicitly declared in her Constitution of 1912 that her boundary between parallels of 32° and 31° 47′ followed the main channel of the Rio Grande as it existed on the ninth day of September, 1850, and this having been confirmed by the United States by admitting her as a State with the line thus described as her boundary, and also approved by Texas in her pleadings, New Mexico cannot question this limitation of her boundary and lay claim to lands east of that line because of changes in the river course since 1850, due to the process of accretion. P. 302.

THIS suit was brought in this Court by the State of New Mexico to settle a controversy over a portion of the boundary between that State and the State of Texas. After argument on final hearing, the case was referred to a Special Master, 266 U. S. 586. The present decision is on exceptions taken by both parties to the Master's report. The exceptions of New Mexico are overruled, and those of Texas sustained. The bill is dismissed and a decree ordered under the cross bill.

By an order made on April 9, 1928, when this part of the volume was nearing the press, certain modifications in the opinion were directed, which are followed in the printing here. The order will be published in volume 276.

*Mr. Frank W. Clancy,* with whom *Mr. Jay Turley* was on the briefs, for complainant.

*Mr. W. A. Keeling,* Attorney General of Texas, with whom *Messrs. John C. Wall, Wallace Hawkins,* Assistant Attorneys General, and *W. W. Turney* were on the briefs, for defendant.

*Mr. Thornton Hardie* as *amicus curiae,* on behalf of L. M. Crawford, by special leave of Court.

MR. JUSTICE SANFORD delivered the opinion of the Court.

This suit was brought by the State of New Mexico against the State of Texas in 1913 to settle a controversy

concerning the location of the part of their common boundary extending southwardly in the valley of the Rio Grande River an air-line distance of about fifteen miles from the parallel of 32 degrees north latitude to the parallel of 31 degrees 47 minutes on the international boundary between the United States and Mexico. This is an off-set in the southern boundary of New Mexico extending nearly to El Paso.

In its bill New Mexico alleged that under certain designated statutes and other public proceedings[1] the channel of the Rio Grande as it existed in 1850 became and was the boundary of Texas and the Territory of New Mexico between these two parallels, that this boundary had "remained unchanged" and "now is" the boundary between the two States, and that a correct delineation of this line in the middle of the channel was shown on a map attached as an exhibit to the bill; and prayed specifically that "the middle of the channel of the Rio Grande as it existed in the year 1850," and as shown upon this map, be "decreed to be the true boundary line." In its answer and cross bill Texas also alleged that the true boundary line is the channel of the Rio Grande as it existed in the year 1850, but denied the correctness of the location shown on the map exhibited with the bill, and alleged that the line was correctly delineated on a map attached as an exhibit to the answer; and prayed that the boundary line

---

[1] Legislative compact of 1850 between the United States and the State of Texas. 9 Stat. 446, c. 49; 2 Sayles' Early Laws of Texas, 267; Pres. Proclamation, 9 Stat. 1005. Gadsden Treaty of 1853 with the Republic of Mexico. 10 Stat. 1031. Act of 1854 declaring the southern boundary of the Territory of New Mexico. 10 Stat. 575, c. 245. New Mexico Enabling Act of 1910. 36 Stat. 557, c. 310. Constitution of New Mexico, Art. 1. Joint Resolution of 1910 reaffirming the boundary line between Texas and the Territory of New Mexico. 36 Stat. 1454. Joint resolution of 1911 admitting New Mexico as a State of the Union. 37 Stat. 39.

" be declared to be the middle of the channel of the Rio Grande as it actually existed in the year 1850," and as shown upon the map exhibited with the answer. And in its answer to the cross bill New Mexico again stated that the true boundary line " is the channel of the Rio Grande . . . as it existed in the year 1850," but denied that this was correctly located on the map exhibited with the answer.

Each State thus asserted that the true boundary line is the middle of the channel of the Rio Grande in 1850. Neither alleged that there had been any change in this line by accretions. And the only issue was as to the true location of the channel in that year.

Upon this single issue a large mass of testimony was taken before examiners, during a period of several years. Some of this, as bearing evidentially upon the location of the river in 1850, related incidentally to subsequent changes by accretions and avulsions. In 1924 New Mexico, on its motion, was allowed by the Court [2] to take, subject to rebuttal, the additional testimony of one witness on the question whether, assuming that in what is known as the Country Club area, the river had been located in 1850 on the western side of the valley as claimed by Texas, it had thereafter moved eastward by accretions. But—still claiming that in fact the river was located in 1850 on the eastern side of the valley, in a position that was inconsistent with such accretions—New Mexico neither averred in its motion that there had in fact been such accretions, nor sought to amend its pleadings so as to allege either that they had taken place, or that, if so, the boundary line had been changed by reason thereof. And the question as to the location of the middle of the channel in 1850, remained, as before, the sole issue under the pleadings.

[2] 264 U. S. 574.

Thereafter, the Court referred the cause to a special master, with directions to make special findings, based upon the entire record, on all material questions of fact, and report the same with his recommendations.[3]  The master, after a full hearing,[4] made his report; to which both States filed exceptions.  And the cause has been heard on the report and these exceptions.

In the territory in dispute the Rio Grande flows southwardly through a plain of alluvial and sandy bottom land, composed largely of detritus, and bordered on the east and west by ranges of hills.  The valley is about four miles wide at the northern end and narrows gradually to a canyon or gorge at the southern end.  The river in normal times is very shallow; but at frequently recurring periods freshets caused by melting snow in the mountains and heavy rains or cloudbursts, flood and overflow the banks of the river and result in many changes in the channel both by erosions and accretions and by sudden and violent avulsions.

At the time the bill was filed the river ran on the eastern side of the valley in the northern portion of the area in dispute, and, crossing the valley in the southern portion, ran on the western side until it reached the gorge.  Neither State claims that this was the location in 1850.  New Mexico, on the one hand, contends that the river then ran the entire distance from the 32nd parallel to the gorge on the eastern side of the valley, near the eastern range of hills.  Texas, on the other hand, contends that it crossed the parallel about three-fifths of a mile westwardly, ran farther to the west in the northern portion of the disputed area, and, crossing about midway to the western side of the valley, ran most of the way to the

[3] 266 U. S. 586.

[4] Printed briefs aggregating 2150 pages were submitted to him.

gorge near the western range of hills. That is, broadly speaking, New Mexico contends that the river then ran on the eastern side of the valley, and Texas, that it ran mainly on the western side. The distance between the two locations midway of the disputed area is about four miles.

The master made an elaborate and thorough report in which he considered at length the contentions of the two States and the salient features of the testimony. He found, on all the evidence, that the allegations of New Mexico as to the location of the Rio Grande "as it existed in the year 1850" were not sustained, and that the river then followed, in general, the course claimed by Texas, and on the dates nearest to 1850 of which there was credible evidence, was located as particularly described in the report,[5] and had an average width of 300 feet; but that thereafter, between 1852 and the filing of the bill, the channel in certain portions of the course, including the Country Club area, was moved eastward by reason of accretions.[6] And he reported that the true boundary line when the bill was filed was the middle of the channel of the river in the location occupied after such accretions, as described in the report,[7] and recommended that this be fixed 150 feet from the east and west banks, respectively, as found by him.

The questions presented are whether the master's finding as to the location of the river in 1850 is correct; and, if so, whether the boundary line was subsequently changed by accretions, and to what extent.

### Location of the Rio Grande in 1850.

1. New Mexico, while not excepting specifically to the ultimate finding of the master as to the location of the

---

[5] Section V (1).       [6] Section VI.       [7] Section VII.

river in 1850, has filed various exceptions to matters
leading to this general finding, by which it challenges the
correctness of certain incidental statements of the mas-
ter; his conclusions as to certain portions of the evidence;
and the fact that he refers to certain official reports and
maps which he thought might be judicially noticed, sev-
eral of which he filed as exhibits to his report. Some of
these exceptions are plainly immaterial. And none of
them need be dealt with separately, as they are merged
in the ultimate question whether, upon the competent
evidence, viewed in its entirety, the master's finding as to
the location of the river in 1850 is correct.

The evidence relating to this matter is so voluminous [8]
that it is entirely impracticable to refer to it in any detail.
And while we have considered the various contentions
relating to its many phases, we can here deal with the
question of its weight only in the broadest outlines.

To establish its contention as to the location of the
river New Mexico relied mainly upon the testimony of a
large number of Indians and Mexicans, most of whom—
with others who did not testify—had been members of
different parties that had accompanied its engineers on
various trips down the river between 1912 and 1914,
shortly before and after the filing of the bill, for the pur-
pose of pointing out the location of the old river; the
testimony of a former registrar of the Land Office, who
had known the river in 1857 and 1858 when conductor on
a stage route and had been employed by New Mexico to
find witnesses having knowledge of the old river; and a
survey of the 32nd parallel made in 1859 by John H.
Clark, United States commissioner, with the testimony of
its engineers, surveyors and others relating thereto.

---

[8] The entire evidence covers about 3500 pages of the record, supple-
mented by about 200 maps, photographs and other documentary
exhibits.

2. While there were various discrepancies and contradictions in the testimony of the witnesses as to the location of the old river, their evidence was to the general effect that at different times between 1850 and 1860, it ran, as they recollected, on the eastern side of the valley, near the eastern range of hills, substantially as claimed by New Mexico.

The master, in dealing with the evidence of the Indian and Mexican witnesses, said: " Most of the witnesses were illiterate; they were unable to estimate distances with any degree of accuracy. . . . All . . . were old men, some very old, and some were only ten years of age or less at the date when they passed along the river between the years 1850 and 1860. There was much evidence that in those years the country was wild and infested with hostile Indians, . . . Many of the witnesses travelled part of the time at night. From White's Ranch to Alamitos, there was but one, if any, house prior to 1857. The names given by the witnesses, therefore, to points along the river with relation to which . . . they located the river . . . , referred to bends, hills, bosques, esteros, cottonwood trees, etc. There was no stage coach route prior to 1857. Many of the witnesses had not travelled along the river since the Civil War; and only a few claimed to have had any continuous knowledge of the river. . . . Moreover, most of the whole river plane or valley had been altered in condition since 1850–1860. In those years, it was uninhabited, uncultivated, and covered in many parts near the river with thick bosques (groves or forests) of cottonwood and tornillo trees. The . . . land, in 1912–1914, was considerably settled and cultivated; the town of Anthony had come into existence; there were farms, cornfields, and alfalfa fields, paved roads and a railroad, in many places where they located the bed of the old 1850 river. . . . In

many years, at the time of annual floods . . . the river covered the whole valley from its western to its eastern margin. When the floods subsided, the river at times resumed its former channel, and at times it did not. . . . [As] testified to by plaintiff's engineer witness, Post: 'There are old river beds or indications of old river beds in various parts of the valley . . . If I had started out to survey old river beds . . . I would not be through surveying yet.' He further stated that in surveying throughout the valley, he had seen old water courses and river beds as distinct and more distinct than that claimed by the witnesses to be the River of 1850. The river has always carried and deposited large quantities of silt, mud and other detritus. At times of flood, many old channels were filled with deposits and their presence effaced. The river valley, at places, . . . has been raised in level many feet. The Santa Fe Railroad has been obliged to raise its railroad bed several times, and in doing so has, at places, excavated from the sandhills at the east. In describing the manner in which they located the river in 1912–1914, the witnesses testified that they walked along depressions, low ground, old channels, etc., which they pointed to Post and the surveyors as the bed of the River of 1850, according to their recollection; that this bed, as a rule, showed banks not more than two or three feet high; . . . that for a considerable distance, at various points, the bed of the old river was then occupied by the railroad tracks, by the county road, and by the river as it flowed in 1912–1914. Many of the witnesses . . . testified that, before they made their trips, the channel of the old river had been outlined by the surveyor's stakes. Several witnesses said that they followed the stakes. . . . Under all the conditions outlined above, I consider it improbable that Indian and Mexican witnesses would be able to trace accurately, on

the ground, the course of a river as it flowed over fifty to sixty years prior."

The master further found that the identification of the point from which these witnesses began their location of the old river, as the place called Alamitos where there had been prior to 1857 a camp or watering place for travelers on the east bank of the river, was "particularly doubtful and difficult of belief"; and that the road leading up the river past Alamitos, to which they referred, did not run on the eastern side of the valley or along the eastern sand hills, as claimed, but up the valley bottom, west of the location of the river claimed by New Mexico and in a position incompatible therewith. And, after referring to the testimony of the former registrar of the Land Office, he concluded: "In view of all the evidence in the case, I am unable to attach great weight or credit to the testimony of the plaintiff's witnesses as to the location either of the bed or of the course of the Rio Grande as it flowed in 1850. . . . I am of opinion that their memories were defective, and especially that they were mistaken as to dates, and that they confused the course of the river as they knew it in later years with their knowledge of it in earlier years. If not so mistaken . . . it is apparent that many of them were testifying as to . . . those periods of the year when the river was in flood and may well have been flowing along the eastern as well as the western banks. There is also evidence . . . as to the existence on the east side of the remains of an old river channel of 1826, which had left sloughs or esteros at various points; also as to the existence of old ditches. . . . It is probable that the river, subsiding from floods, at times ran in these sloughs, esteros, or ditches, as a minor channel or branch, and that it was thus mistaken by some witnesses for the main channel of the river."

83583°—28——19

3. The survey of John H. Clark, United States commissioner, was made by him as a member of the United States and Texas Boundary Commission,[9] in and after 1859, of a portion of the boundary line between Texas and the Territories of the United States, including the lines of the 103rd meridian and the 32nd parallel between that meridian and the channel of the Rio Grande River, which then constituted part of the boundary between Texas and the Territory of New Mexico,[10] connecting on the west with the line running down the channel of the river here in dispute. In 1891 the lines of the meridian and parallel established by Clark were " confirmed " by an Act of Congress and a Joint Resolution of the Texas Legislature as boundary lines between Texas and the Territory of New Mexico.[11]

The significance of Clark's survey lies in its bearing upon the location of the east bank of the Rio Grande in 1859. His report shows, admittedly, that he placed at the initial point of the survey on the 32nd parallel, a pyramid of stone, designated as Monument No. 1, standing 600 feet

---

[9] This Commission was appointed under a Texas Act of 1854, 3 Gammel's Laws of the State of Texas, 1525, and an Act of Congress of 1858, 11 Stat. 310, c. 92, to run and mark the entire boundary line between Texas and the territories of the United States from the point where it left the Red River to its intersection with the Rio Grande. The Commissioners began at the Rio Grande, but soon separated and the survey was continued by Clark, the United States commissioner. See, generally, *Oklahoma* v. *Texas,* 272 U. S. 21, 26. His original report, with the accompanying field notes and maps, have long been lost; but a copy of portions thereof contained in Sen. Ex. Doc. No. 70, 47th Cong., 1st Sess., in which the maps appear on a reduced scale, was introduced in evidence by stipulation.

[10] Legislative compact of 1850 between the United States and the State of Texas; Gadsden Treaty of 1853 with the Republic of Mexico; and the Act of 1854 declaring the southern boundary of the Territory of New Mexico: cited in Note 1, *supra.*

[11] 26 Stat. 948, 971, c. 542; 10 Gammel's Laws of the State of Texas, 195. See *Oklahoma* v. *Texas, supra,* 31.

from the east bank of the river. This monument has long
since disappeared. New Mexico contended that, as shown
by the field notes and as re-established by its engineers
with reference to other objects called for in the field notes
and shown on the maps, the location of this Monument
coincided with that of Station 1 on the survey of the paral-
lel from which Clark took the bearings of various objects,
and that the river bank was thereby fixed at a point 600
feet west of this Station—whose location was agreed
upon—substantially as shown by the witnesses who testi-
fied to the location of the old river. On the other hand,
re-established by its engineers with reference to other
objects, this Monument was located at a point about
2800 feet west of Station 1, and the river bank was thereby
fixed at a like distance west of the location claimed by
New Mexico; and further, that in 1911–1913 this Monu-
ment had been re-established at a point about 200 feet
west of the location shown by its witnesses, by joint com-
missioners of the United States and Texas, and this
re-establishment was binding upon New Mexico, irrespec-
tive of its precise accuracy.

The basis of the latter contention is this: Before the
Territory of New Mexico had been admitted as a State
under the Enabling Act of 1910,[12] a constitution was
adopted for the proposed State,[13] which, disregarding
entirely the lines of Clark's survey, declared in general
terms that its boundaries ran along the 103rd meridian to
the 32nd parallel, along that parallel to the Rio Grande,
as it existed on September 9, 1850, and with the main
channel of the river, as it existed on that date, to the
parallel of 31 degrees and 47 minutes. Thereupon, in

---

[12] 36 Stat. 557, c. 310. ·

[13] Ho. Doc. 1369, 61st Cong., 3rd Sess. This constitution was
adopted by a constitutional convention in November, 1910, and ratified
by the voters in January, 1911.

February, 1911, Congress, by a Joint Resolution [14] declared that any provision of this constitution that tended to annul or change the established boundary lines between the Territory and the State of Texas [15] run by Clark in 1859 and 1860, " shall be of no force or effect " and be construed so as not to affect or alter the Clark lines in any way; and that the ratification of these lines by the United States and the State of Texas in 1891 " shall be held and deemed a conclusive location and settlement of said boundary lines," and the lines run and marked by monuments along the 103rd meridian and the 32nd parallel shall " remain the true boundaries of Texas and New Mexico." This Resolution further authorized the President, in conjunction with the State of Texas, to re-establish and re-mark the Clark boundary lines, and, for such purpose, to appoint a commissioner who, with a commissioner for the State of Texas, should re-mark the boundary between the Territory of New Mexico and Texas on the line run by Clark for the 103rd meridian to the southeast

---

[14] No. 6. Reaffirming the boundary line between Texas and the Territory of New Mexico. 36 Stat. 1454.

[15] The Senate Judiciary Committee in recommending the passage of this resolution, said: " The contention of the constitutional convention of New Mexico . . . seems to be that the boundary line . . . from latitude 36.30° north to latitude 32° north is located west of the true one hundred and third meridian . . . , and that a strip of territory between the true . . . meridian and the line as now established and recognized by the United States and the State of Texas . . . of right belongs to New Mexico." Sen. Rep't No. 940, 61st Cong., 3d Sess. And the President, in a message recommending its passage, said that the proposed constitution " contains a clause purporting to fix the boundary line between New Mexico and Texas which may reasonably be construed to be different from the boundary lines heretofore legally run, marked, established, and ratified by the United States and the State of Texas, and under which claims might be set up and litigations instigated of an unnecessary and improper character." Ho. Doc. No. 1076, 61st Cong., 3d Sess.

corner of New Mexico, and thence west with the 32nd
parallel as determined by him to the Rio Grande; the
position of the boundary lines as marked by him to be
determined by his old monuments and lines where found
on the ground, or otherwise by their original position as
shown by parol evidence or his topographical maps and
field notes.

In August, 1911, Congress, in a Joint Resolution [16] de-
claring that New Mexico should be admitted as a State
upon compliance with certain specified conditions, specifi-
cally provided that such admission " shall be subject to
the terms and conditions of " the Joint Resolution of
February, 1911. In February, 1912, New Mexico was
admitted as a State.[17]

Thereafter, the joint commissioners appointed to re-
mark the Clark boundary lines—commonly called the
Scott-Cockrell Commission—submitted to the President
reports of their proceedings. In one of these, relating to
Clark's Monument No. 1 on the 32nd parallel, they stated
that, on completing their field work in September, 1911,
being unable after a second effort to locate this Monument
from any physical facts found upon the ground or oral
testimony, they had determined the approximate scale of
the topographical map accompanying Clark's report, and
measuring westward on the ground from his Monument
No. 4 the distance to his Monument No. 1 indicated on the
map, had re-established his Monument No. 1 at the point
thus ascertained, and erected there a concrete monument
marked to show such re-establishment. In February,
1913, the President by an Executive Order [18] approved the

---

[16] No. 8, 37 Stat. 39.

[17] President's Proclamation, 37 Stat. 1723.

[18] No. 1716, February 25, 1913. This Order directed that a copy
of the commissioners' reports, plat and field notes, should be deposited
in the permanent archives of the General Land Office as a perpetual
memorial of the existence and location of the boundary line.

reports of the commissioners, and confirmed and estab-
lished their findings, conclusions and acts for the establish-
ment and demarcation of the boundary lines between New
Mexico and Texas.

The Clark Monument No. 1, as re-established by the
Scott-Cockrell Commission, is almost exactly 3,000 feet
west of Station 1; and if this is conclusive as to its origi-
nal location, places the river bank in 1859 substantially in
the position claimed by Texas. As to this, New Mexico
contended that in re-establishing the Monument the Com-
mission had mistaken Clark's Monument No. 3 for his
Monument No. 4 and consequently started the measure-
ment from a point 3,000 feet too far to the west; and fur-
ther, that as the re-establishment was not made until after
New Mexico had been admitted as a State, it was not
bound thereby.

The master, in dealing with Clark's survey—as to which
there was much conflicting evidence—and the re-estab-
lishment of Monument No. 1, found, as a matter of law,
that New Mexico was bound by the Clark lines as re-
established by the Commission and could not challenge
the correctness of its acts, and that hence, in locating
the boundary line extending southwardly from the 32nd
parallel through the valley, the starting point on the
parallel could not be fixed east of the re-established Mon-
ument. And he further found that it was shown by the
evidence, as a matter of fact, that the location of Clark's
Monument No. 1 did not coincide with that of Station 1,
but was at a point 2783 feet west of that Station, 216.5
feet east of the point where the Monument had been re-
established by the Commission, thereby showing that the
river bank was at least 2783 feet west of the location
claimed by the witnesses for New Mexico; that the theory
that the Commission had measured from Monument No.
3 instead of Monument No. 4, was without basis; and
that the location of Monument No. 1, either as found by

him or as fixed by the Commission, was utterly inconsist-
ent with the location of the river claimed by New Mexico.

. 4. In support of its contention as to the location of the
river, Texas further relied upon various old surveys, pat-
ents and maps, and the testimony of its engineers in regard
thereto, as showing the true course of the river south-
wardly through the valley from the point where it crossed
the parallel. These documents consisted mainly of the
so-called Salazar-Diaz Survey of the Rio Grande, made
in 1852 by Diaz, a Mexican engineer, by order of Salazar,
the Mexican member of the Joint Boundary Commission
under the Treaty of Guadalupe-Hidalgo;[19]—a survey
made in 1860 and a resurvey made in 1886, by Texas
surveyors, of a Mexican grant on which Texas reissued a
patent in 1886;—surveys made by Texas surveyors be-
tween 1848 and 1873, several of which were bounded on
the west by the river bank, on which Texas issued patents
between 1860 and 1874;—maps of surveys made in 1852–
1853 and 1855 under the direction of the American sur-
veyor for the Joint Boundary Commission under the
Treaty of Guadalupe-Hidalgo and the American member
of the Joint Boundary Commission under the Gadsden
Treaty, and agreed to by the Joint Commissions, which
showed the course of the river;—and War Department
maps of surveys made in 1854–1856 in the course of explo-
rations for a railroad route to the Pacific Ocean, likewise
showing the course of the river. And Texas also relied
upon long acquiescence by the United States before the
Territory of New Mexico had been admitted as a State.

The Salazar-Diaz Survey covered the course of the Rio
Grande through all the area in dispute except in the
extreme northern portion. The evidence of this Survey
consisted of two copies of a document containing Diaz'
memoranda and field notes. One was a copy of the

[19] 9 Stat. 922.

original document in the archives of the International Boundary Commission under the Convention of 1889,[20] which was authenticated by a certificate of the Mexican Commissioner. This was introduced in evidence by Texas, over the objection of New Mexico that the Commissioner had no authority to make such a certificate.[21] A few days later counsel for New Mexico stated that they would offer in evidence a copy of these memoranda and field notes properly certified by one of the departments of the Mexican Government. They later furnished counsel for Texas a copy certified by a government officer in the City of Mexico.[22] The copy so furnished was thereafter introduced by Texas, without objection; and engineers of both States were examined and cross-examined as to their work and calculations based on this copy, concerning the reproduction of the survey on the ground. Two years later, in 1918, on the day that the taking of testimony was closed by agreement, New Mexico moved to strike out both copies from the record on the ground that they were not so authenticated as to be admissible in evidence; and introduced evidence in support of this motion for the purpose of showing that there was not in fact any original of the document in the department in the City of Mexico as they had believed when they furnished the copy to the counsel for Texas.

We agree with the view of the master that the objections to the two copies were not well taken. The first was

---

[20] 26 Stat. 1512.

[21] This copy also contained a calculation of courses that had been made from the field notes, in 1911, by an engineer for the International Boundary Commission. This calculation, which the master found to be inadmissible, played no part in the evidence in the case.

[22] This did not contain the engineer's calculation of courses, but contained a copy of Diaz' diary. Otherwise the memoranda and field notes were substantially the same as in the first copy.

admissible upon authentication by the Mexican Boundary Commissioner having proper custody of the original. See *United States* v. *Wiggins,* 14 Pet. 334, 346, and *United States* v. *Acosta,* 1 How. 24, 26. And under all the circumstances the motion to exclude the second copy came too late, apart from any question as to its proper authentication. See *Benson* v. *United States,* 146 U. S. 325, 333.

There was much conflict in the evidence of the engineers for New Mexico and Texas as to the location of the river as shown by the Salazar-Diaz Survey, which was described in the field notes by traverse from triangulation points; also as to the location of the Texas patent on the Mexican grant and other Texas surveys and patents. New Mexico also challenged the authenticity of the Salazar-Diaz Survey.

5. The master found from the evidence: That the Salazar-Diaz Survey was authentic; that the course of the river as surveyed in 1852 had been reproduced by the engineers for Texas, by traverse from the triangulation points, with substantial correctness, and that even if the engineers for New Mexico were correct in certain contentions, the resultant reproduction would not place the river anywhere near the location claimed by New Mexico;—

That the boundaries of the patent issued by Texas on the Mexican grant—which extended nearly across the entire valley—except possibly the river boundary, could be substantially identified on the ground, and by far the greater part of the land patented was west of the location of the river claimed by New Mexico;—

That, although according to New Mexico's contention as to the location of the river a large part of the Texas surveys for lands lying between the 32nd parallel and the Mexican grant claiming a frontage on the river, would be located in the sand-hills east of the valley, they were in fact located in the valley;—

That, although some of the Texas surveys for lands lying south of the Mexican grant and extending to the end of the valley, might, if exactly surveyed now, extend across the river and on the western bank, they claimed land lying, at least in part, west of the location of the river for which New Mexico contended, and that the western line of the lands claimed in the surveys and patents fairly corresponded, with minor variations, to the line of the river shown by the Salazar-Diaz Survey;—and

That the Salazar-Diaz Survey was corroborated by certain of the maps of the surveys made for the Joint Boundary Commissions and the War Department, and by a map accompanying Clark's survey of the 32nd parallel, and that all these maps—as well as certain other maps that had not been introduced in evidence, but of which he thought judicial notice might be taken—sustained the contention of Texas as to the course of the Rio Grande in 1850 and were inconsistent with the contention of New Mexico.

He further found that, for many years prior to the admission of New Mexico as a State in 1912, surveys were made by Texas surveyors and patents issued by Texas on substantially all the land in the area in dispute;[23] that the occupancy and physical possession of this land by Texas patentees and persons claiming under them, had been admitted by counsel at the hearing before him; that there was no evidence that from 1850 to 1911 the United States had issued any patents specifically covering lands east of the river as located by the Salazar-Diaz Survey, or conflicting with any of the patents issued by Texas; and

[23] New Mexico specifically alleged in its bill that Texas had attempted to assume jurisdiction over land lying to the west of the channel of the river as it existed in 1850, and had made grants, conveyances, patents and surveys thereof

that, for at least thirty years prior to the admission of the Territory of New Mexico as a State, the United States made no challenge of the claims to lands asserted by Texas and its citizens and, impliedly at least, recognized the practical line that had been established as the boundary between the Territory and Texas.

The master concluded on all the evidence that the allegations in New Mexico's bill as to the location and course of the Rio Grande " as it existed in the year 1850 " were not sustained, and that the river did not then flow on the eastern side of the valley as claimed by New Mexico; that its location and course in 1850 was, in general, as alleged in the cross-bill of Texas, and, in particular, that on the dates nearest to 1850 of which there was credible evidence it followed the course set forth in his report and described by reference to Clark's Monument No. 1, two Texas surveys made in 1860, a Texas survey made in 1849, and the Salazar-Diaz Survey of 1852, substantially as reproduced by the engineers for Texas; and that under the testimony the average width of the river should be estimated as 300 feet, and the middle of the channel fixed at 150 feet from the line of its east bank as shown by the Texas surveys, and 150 feet from the line of its west bank as shown by the Salazar-Diaz Survey.

6. We need not determine whether any of the documents referred to by the master that had not been introduced in evidence were properly the subject of judicial notice. Be that as it may, since New Mexico had no opportunity to introduce evidence in explanation or rebuttal of them, we have not considered them in reaching our own conclusions.

7. Upon the whole case we are satisfied that the master's finding as to the location of the river in 1850 is substantially correct, and fixes its course as accurately as is

possible after the lapse of more than three-quarters of a century. Without attempting to set out our reasons in detail, we conclude: That the testimony of the witnesses as to their recollection of the old river is far from satisfactory, and does not, in view of the other evidence in the case, sustain the burden of proof resting upon New Mexico;—that the greater weight of the evidence shows that Clark's Monument No. 1 did not coincide with Station 1, but was located at least 2783 feet west thereof, substantially as re-established by the Scott-Cockrell Commission;—that under the Joint Resolutions of February and August, 1911, preceding and conditioning the admission of New Mexico as a State, it is bound by the re-establishment of the Monument by the Commission and cannot question its accuracy;—that this necessarily extends the Clark boundary line along the 32nd parallel to the east bank of the river, at a point 600 feet west of the re-established Monument;—that, according to the greater weight of the evidence, the river, in 1850, or as near thereto as may now be determined, ran southwardly through the valley from the parallel, as shown by certain of the surveys, patents and maps relied on by Texas—especially the Salazar-Diaz Survey of 1852, the Texas surveys of 1849 and 1860, the maps of the surveys made in 1852–1855 for the Joint Boundary Commissions, and the Clark map of 1859—on the course and in the location set forth and described in the master's report;—and that this conclusion is reinforced by the tacit and long-continued acquiescence of the United States, while New Mexico was a Territory, in the claims of those holding the land in controversy under Texas-surveys and patents, and the undisturbed possession of the Texas claimants. In short, we find that New Mexico has failed to sustain the burden of proof, and that the master's report is in accord with the greater weight of the evidence.

8. New Mexico's exceptions to so much of the report as deals with the location of the river in 1850, are accordingly overruled.

### Accretions.

Both States have filed exceptions to the master's report in reference to accretions. Texas, on the one hand, insists that he was in error in reporting as the boundary line the location occupied by the river after it had been moved eastward from its location in 1850 by accretions. New Mexico, on the other hand, insists conditionally—that is, only if its exceptions as to the location in 1850 are not sustained—that in determining the accretions in the Country Club area the master fixed the line of such accretions in an indefinite manner and not far enough to the east. We find that the contention of Texas is well taken and the conditional contention of New Mexico is therefore immaterial.

This case is not one calling for the application of the general rule established in *Nebraska* v. *Iowa,* 143 U. S. 359, *Missouri* v. *Nebraska,* 196 U. S. 23, *Arkansas* v. *Tennessee,* 246 U. S. 158 and *Oklahoma* v. *Texas,* 260 U. S. 606, as to changes in State boundary lines caused by gradual accretions on a river boundary.

We reach this conclusion without reference to the fact that there were no issues under the pleadings as to accretions or changes in the boundary line since 1850, and without considering the propriety of permitting amendments to the pleadings, since in any event the outcome must be the same.

By the legislative compact created by an Act of Congress of September 9, 1850, and an Act of the Texas Legislature of November 25, 1850, the channel of the Rio Grande southwardly from its intersection with the 32nd parallel was established as a boundary between Texas and the territory of the United States. By this same Act of Congress the Territory of New Mexico was created, and

by that Act, supplemented by an Act of 1854 following
the Gadsden Treaty, the channel of the river between the
32nd parallel and the parallel of 31 degrees 47 minutes
became a boundary between the Territory of New Mexico
and the State of Texas.[24]

New Mexico, when admitted as a State in 1912, ex-
plicitly declared in its Constitution that its boundary ran
"along said thirty-second parallel to the Rio Grande
. . . as it existed on the ninth day of September, one
thousand eight hundred and fifty; thence, *following the
main channel of said river, as it existed on the ninth day
of September, one thousand eight hundred and fifty, to
the parallel of thirty-one degrees, forty-seven minutes
north latitude."* This was confirmed by the United States
by admitting New Mexico as a State with the line thus
described as its boundary; and Texas has also affirmed the
same by its pleadings in this cause. Since the Consti-
tution defined its boundary by the channel of the river as
existing in 1850, and Congress admitted it as a State with
that boundary, New Mexico, manifestly, cannot now
question this limitation of its boundary or assert a claim
to any land east of the line thus limited. And it was
doubtless for this reason that New Mexico alleged in its
pleadings and has consistently asserted throughout this
litigation that the true boundary is the channel of the
river as it existed in 1850.

The exceptions of Texas to so much of the master's re-
port as deals with the question of accretions and fixes the
boundary with reference thereto, are accordingly sus-
tained; and the conditional exceptions of New Mexico to
so much of the report as relates to accretions in the
Country Club area, are overruled.

### Conclusion.

Our conclusion on the entire case is that the boundary
line between New Mexico and Texas in the area in dis-

---

[24] All these Acts are cited in Note 1, *supra.*

pute is the middle of the channel of the Rio Grande as it was located in 1850, extending southwardly from the parallel of 32 degrees north latitude to the parallel of 31 degrees 47 minutes, as found and described by the master in Section V (1) of his report; the intersection of the east bank of the river with the line of the 32nd parallel to be taken at a point 600 feet west from the Clark Monument No. 1 as re-established by the Scott-Cockrell Commission, and the middle line of the channel to be taken 150 feet from the east and west banks of the river, respectively, as found by the master.

It results that the bill of New Mexico must be dismissed; and that, under the cross-bill of Texas, the line above described must be decreed to be the boundary between the two States.

This boundary line should now be accurately surveyed and marked by a commissioner or commissioners to be appointed by the Court, whose report shall be subject to its approval.

The parties may submit within forty days the form of a decree to carry these conclusions into effect.

> *Bill dismissed and decree directed under cross-bill.*