·C. J. & A. M. HOLMAN, Appellants, v. JAMES M. HODGES.

·Riparian Rights: ACCRETION AND RELICTION. Where an island arose in a navigable river apart from riparian owner's land, such owner can claim no title thereto by reason of riparian
1  rights, though the island was afterwards joined to their land, since it did not become part thereof by gradual accretion to or reliction from the shore.

·TITLE OF STATE. Where an island sprung up from the bed of a navigable river, and was afterwards joined to the mainland,
2  the state's title thereto, as owner of the river bottom does not recede from the land with the water, as that occurs only in case of gradual accretion or reliction; but continued in the state.

·SAME: *Accretion after grant to state.* Where an island arose in 1857 near the middle of a navigable river bounding the state of Iowa it did not pass under Revised Statutes United States,
3  ·section 2479, granting all swamp and overflowing lands to the states in which they lay, since it was not in existence when the act was passed.

.*Appeal from Woodbury District Court.*—HON. G. W. WAKE-FIELD, Judge.

THURSDAY, JANUARY 17, 1901.

THE plaintiffs, as owners of lots 3 and 4, bordering the Missouri river, in this suit asked that title be quieted in them to a bar or island formed in the river, a part of which was ·occupied by the defendant. The district court denied the relief, but adjudged them to be owners up to what is called the "Iowa Channel," the lines to be established by a commis-·sioner. They appeal.—*Affirmed.*

*Lewis & Beardsley* for appellants.

*E. J. Stason* for appellee.

LADD, J.—There is little controversy concerning the facts of this case. The plaintiffs have been owners of lots 3 and 4, bordering the Missouri river, since 1862. A bar began to form opposite these, near the middle of the stream, in 1857. Certainly it had not appeared in 1856, as the ferryboat went directly across without obstruction. The following year a steamboat ran aground on the bar, and for several years afterwards boats were compelled to avoid it by following the current on either side. As early as 1861, according to one of the plaintiffs, it was a half mile wide, and has been added to until it is now two to three miles long. By 1870 the northern part was overgrown with willows, and, though the main current of the river had gradually changed to the west of the bar or island, that part to the east was still 15 or 20 rods wide, with a distinct current. Since then willow and cottonwood trees have sprung up on the bar, a small part was cultivated in 1878, and it has been occupied for agricultural purposes since 1886. During all these years alluvial deposits have been added to the north, south, and west. In 1870 accretions began to form on plaintiffs' lots and this has been going on ever since. The water at ordinary stage continued to flow between plaintiffs' land and the island until about 1887, and it has run through a well-defined channel during the spring and June rise of the river up to the present time. Without setting out the evidence in detail, it is enough to say that the formation of the bar or island has been entirely distinct from any accretion to the shore. It arose near the middle of the river, though probably east of the thread of the then main current, without any connection with the Iowa shore, and was gradually added to by accretion or reliction until an island of the proportions mentioned was formed. Not only is this true, but the conclusion seems inevitable

from the circumstances shown that the additions to plaintiffs' land, whether from accretion thereto or the receding of the waters, have resulted from the formation of the island. Its existence undoubtedly changed the main current of the river, and by its growth to the northeast gradually cut off the stream formerly flowing between it and the shore. Whether this be true, however, need not now be determined. It is enough for the purposes of this case that the land beyond the channel last mentioned was formed independently of plaintiffs' land. It then never became part of their lots through the process of accretion or reliction.

II. But the appellants insist that, even if all we have said be true, yet are they the owners of the island. They argue that, as the state acquired title to the soil at the bottom of the river, as the latter receded towards Nebraska, it ought to be excluded from any claim to the part of the bottom abandoned; in other words, it seems to be thought that the state's title ought to be limited to the soil covered by the waters. And it is said that, even though it may have owned the island when surrounded by water, that title moved from beneath it as the river receded, and the land became plaintiffs' as soon as connected with shore. It is conceded that no authorities have been found announcing such a doctrine, and we have been unable to discover any case awarding a riparian owner land because connected to his own, save when this has occurred through the imperceptible accretion or the reliction thereof by the gradual receding of the waters. The argument that this should be the rule, for that, while he may gain, he is equally likely to lose, is that on which ownership to the center of an unnavigable stream is grounded. And it may have had some influence in decisions declaring title in the riparian owner to the middle of a navigable stream above tide water. See *Morgan v. Reading*, 3 Smedes & M. 366. No question is made but the Missouri river at this point is a navigable stream, and that ordinarily

the riparian owner has no title beyond high-water mark. *Mc-Manus v. Carmichael*, 3 Iowa, 1; *Haight v. City of Keokuk*, 4 Iowa, 199; *Tomlin v. Railway Co.*, 32 Iowa, 106; *Houghton v. Railroad Co.*, 47 Iowa, 370; *Bennett v. Manufacturing Co.*, 103 Iowa, 207. Nor is it doubted that title to the soil at the bottom of such a river from high-water mark to the middle of the channel is in the state. *Railway Co. v. Porter*, 72 Iowa, 426; *Pollard v. Hagan*, 3 How. 225 (11 L. Ed. 565); *Hardin v. Jordan*, 140 U. S. 371 (11 Sup. Ct. Rep. 808, 838, 35 L. Ed. 428). As said in the last case: "Such title to the shore and land under water is regarded as incidental to the sovereignity of the state, a portion of the royalties belonging thereto, and held in trust for the public purposes of navigation and fishery, and cannot be retained or granted out to individuals by the United States. Such title being in the states, the lands are subject to state regulations and control, under condition, however, of not interfering with the regulations which may be made by congress with regard to public navigation and commerce." Contrary to the views of this court expressed in *Dunleith & Dubuque Bridge Co. v. Dubuque Co.*, 55 Iowa, 558, the supreme court of the United States, in *Iowa v. Illinois*, 147 U. S. 1 (13 Sup. Ct. Rep. 239, 37 L. Ed. 55) laid down the rule "that the true line in navigable rivers between the states of the Union which separate the jurisdiction of one from the other is the middle of the main channel of the river. Thus the jurisdiction of each state extends to the thread of the stream; that is, to the mid-channel, and, if there be several channels, to the middle of the principal one, or, rather, the one usually followed." As this island, then, was formed on the bottom of the river, connected in no way with the shores, it would seem that title continued in the state. It rests on soil which, when beneath the surface of the water, belonged to the state, and, if no longer its property, when was the title devested? The moment the bar appeared above the surface of the water?

If so, who acquired it? Surely not the plaintiffs, for at that time a stream 40 or 50 rods wide separated it from their land. And its separation is still marked by a distinct channel to which the waters gradually receded up to 1887, and through which they still flow at the annual freshets. Nor do we think there is any ground for supposing title to shift as suggested. True, Lord Coke referred to what he designated a "movable freehold," as where the owner of the seashore acquires or loses land as the sea recedes or approaches. See Kent, Commentaries (11th ed.) 547. In that sense title to land bordering the Missouri river may be said to be movable, for no one at night may safely predict what will be his boundary line the next morning. The state may lose part of the bottom of the stream by accretions to the riparian owner's land, or by reliction. But this is because it occurs through these processes, for the state is governed by rules applicable to the individual owner. That the state acquired title to soil at the bottom of the stream previously belonging to Nebraska or to private owners furnishes no ground for depriving it of the property it held. As well say, because of plaintiffs' acquiring a large body of land by accretions, they should be dispossessed of that previously owned, or divide it with adjoining owners to the east. The theory of appellants seems to be that, as they may be losers by a future change in the river, this land should be wrested from the state to compensate them for such possible loss. This would be robbing Peter to pay Paul. There is no more reason for saying the state loses title to an island when connected by accretions to the shore than to say title to an islet formed at one side of the thread in an unnavigable stream is lost when connected with another's land on the opposite side. The thought that title swims out from under an island as new bottom is acquired is not founded on any sound principle of reasoning. Title is never lost or found in any such evanescent manner. As said in *Benson v. Morrow,* 61 Mo. 347, the owner of contiguous land

is not "the owner of an island that springs up in the midst of the stream, whether the island be on one side or the other of the thread of the river. He goes only to the margin of the river. It would also logically follow that if, by accretions to such island, the water margin should unite with the shore, the newly-made land would become a part of the island, and the riparian ownership would not be extended." In *Cooley v. Golden,* 117 Mo. 33 (23 S. W. Rep. 104, 21 L. R. A. 300), the same court, after referring to previous decisions declared that: "It makes no difference in principle that the islands in these cases had been surveyed and disposed of by the United States. The riparian owner would not take the accretion, for the reason that it was not added to his own land. Pole Island sprang up in the midst of the stream, far enough from the shore which bounded plaintiff's land to admit at times of the passage of boats between it and the shore. The banks of the island and that of the north shore of the river afterwards united by accretions formed by the washings of the water, and plaintiff was only entitled to such part thereof as was formed on his land." This was followed in *Perkins v. Adams,* 132 Mo. 131 (33 S. W. Rep. 778),—a case in its facts much like the one at bar,—where it is broadly stated that, if the disputed ground was "not formed to the land on the bank of the river by gradual accretions of the land thereto, or by gradual reliction of the adjoining bed of the river by the receding of the waters, then plaintiff is not entitled to recover, whether the land be called an island, or a sand bar, or other designation." The same principle is perspicuously stated by the court of civil appeals of Texas in *City of Victoria v. Scholt,* 9 Tex. Civ. App. 332 (29 S. W. Rep. 681), which we quote with approval: "The uncontradicted evidence shows that the land thus claimed to be an accretion was formed in the stream as an islet, and that the stream for many years after its formation ran on each side of it. Four or five years since, the water receded from that.

division of the bed which lay between the islet and plaintiff's land, and has, since such recession, flowed entirely through the channel east of the islet. Such recession did not change the title to the soil in the islet as it was before. Upon the formation of the islet, the title to it vested, and was not changed by the change in the river, as that was not a gradual and imperceptible accretion. The islet, when formed, was an accretion to the soil in the bed of the stream, and the owner of such bed became the owner of the accretion. In navigable streams the soil, and hence all islands formed upon it, belong to the sovereign." As announcing the same principle, see *Morris v. Brooke,* 53 Am. Rep. 215; *People v. Warner,* 116 Mich. 228 (74 N . W. Rep. 705); *Bigelow v. Hoover,* 85 Iowa, 161. See, also, *Indiana v. Kentucky,* 136 U. S. 479 (10 Sup. Ct. Rep. 1051, 34 L. Ed. 329).

III. The island did not pass under the swamp-land grant, for it was not in existence at that time, and it was never a part of the government domain. As the plaintiffs acquired no interest in the land beyond what is called the "Iowa Channel," it is unnecessary to consider what title must be established in order to have it quieted. The decree of the district court was in harmony with these views, and is AFFIRMED.