WUBBINA KATHERINE RAND et al., appellees, v. WILLIAM H. MILLER et al., appellants.

T. J. RAND et ux., appellees, v. WILLIAM H. MILLER et al., appellants.

No. 49650.

(Reported in 95 N.W.2d 916)

■

■

■

April 8, 1959.

Gene O'Sullivan, of Omaha, Nebraska, and Russell McKay, of Logan, for appellants.

K. C. Acrea, of Missouri Valley, for appellees.

Thompson, C. J.—Responsibility for this litigation rests with the restless Missouri River. Like a tormented soul, this mighty stream wanders from side to side of its channel, and intermittently and frequently breaks away from the course it had formerly chosen and creates new boundaries. This is a

course of conduct not unknown to rivers; but the Missouri, at least along the Iowa-Nebraska shores, is peculiarly given to deviations.

The case before us arises because of the eccentricities of the river at a locality between Harrison County, Iowa, and Washington County, Nebraska, known as the DeSoto Bend. Here, as elsewhere, the Army Engineers have made determined efforts to control it; but the great river does not surrender easily, and the attempts have not been entirely successful. It seems apparent that prior to the middle 1930s the river had for many years, certainly since prior to 1912, been swinging farther to the right or west; and as it did so, it cut into the Nebraska shore and receded from the Iowa shore. As it receded it deposited soil and sand along the former Iowa bank and so, as plaintiffs allege, built up the land now in controversy attached to their properties on the Iowa side. They claim them by accretion and also by deed and adverse possession. The defendants deny that the lands are accreted lands; they say the main channel of the river was along the Iowa side, through what they term a "chute" existing there for many years; and further allege that whatever lands were built up there were entirely washed away when the river changed its mind, and its channel, in the 1930s. At that time it cut across the foot of the Bend, and remains there, the Army Engineers and the Iowa-Nebraska Boundary Commission to the contrary notwithstanding. The real estate in question is now attached to the Nebraska shore, and the defendants have taken possession of it. We shall at this point eliminate the defendants' claim to title by adverse possession, since their evidence does not show any possession prior to 1952 at the earliest; nor do they argue the point in their brief.

I. For reasons concerned with the state of the record, which will be referred to later, it is difficult to make a satisfactory statement of the material facts; and a proper determination of the case depends upon facts rather than legal principles, which are not in serious dispute or difficult of understanding. The plaintiffs in each case contend that the weight of the evidence shows first, that the land in dispute is accretion land which became attached to plaintiffs' realty on the Iowa shore as the river swept farther to its right; second, that it was disconnected

or cut off from plaintiffs' lands by an avulsion of the river, occurring about 1946 or 1947; and third, that some of said land is still identifiable. If plaintiffs have proven each of these contentions by the greater weight of the evidence, they are entitled to prevail and we need not consider their other claims.

We recognize ownership of riparian lands by accretion. Solomon v. City of Sioux City, 243 Iowa 634, 636, 51 N.W.2d 472, 475. The Missouri River is a navigable stream, and in Iowa the adjoining owner's title extends to the ordinary high-water mark of the river, ownership from such high-water mark to the thread of the stream being in the State. The story of the accretion of the lands in question to the plaintiffs' properties on the Iowa bank is told by their witnesses, who had lived in the vicinity from 1912 to the time of the trial. From 1912, perhaps prior thereto, the river was swinging farther and farther south in the bottom of the DeSoto Bend, thus eating more and more into the Nebraska shore and depositing more and more soil on the north, or Iowa, bank. The tract involved in the consolidated cases, and which it is contended accreted to plaintiffs' lands, is of substantial extent. We shall not repeat here the legal descriptions, which are lengthy and would require considerable space. It is sufficient to say that in our consideration and determination of the case we are speaking of the lands as described in the plaintiffs' petitions.

II. It is further shown by plaintiffs' evidence that when the Army Engineers attempted, about 1935, to slow the current running through the Bend by constructing dikes on the Nebraska side about at the top of the Bend, the result was to throw the current across to the Iowa side; at least these dikes apparently had a greater effect than was intended, and the river began to eat into the Iowa shore. An attempt was made to control this by dikes built along the Iowa bank; at least some of them, plaintiffs contend, being largely constructed by dry land operations from the Iowa shore. But when World War II intervened, these operations were ended, and about 1946 or 1947 the river broke through the top of the Bend, cutting straight across along the Iowa shore, and thereby creating an avulsion which cut off plaintiffs' accreted lands from the bank. At least to the time of the trial the river continued to flow in this channel, and

the old channel along the Nebraska side became entirely dry, so that the defendants were able to cross from their lands and about 1952 or 1953 began to make certain improvements in the way of roads, cutting timber, and otherwise reducing the land to a usable condition. Where for many years the river created the DeSoto Bend by swinging first southeast, then at the bottom of the Bend northeast, thus forming an arc resembling a taut bow, it has now cut through along the line of the bowstring at the top. However, this is not to be the permanent or stabilized channel. This channel, according to the plans of the Army Engineers, will be substantially where it was around the Bend before the break-through of the middle 1940s. This seems to be also the substance of the Iowa-Nebraska Boundary Compromise, an agreement reached by boundary commissions of the two states and made effective by approval of their legislatures and the Congress of the United States. See Iowa-Nebraska Boundary Compromise, pages XC-XCI, Code of Iowa of 1958.

■ It is correct that if these lands had been made a part of plaintiffs' properties by accretion and later disconnected therefrom by an avulsion, a sudden shifting of the river channel, they are still owned by plaintiffs. Payne v. Hall, 192 Iowa 780, 783, 185 N.W. 912, 914; Coulthard v. Stevens, 84 Iowa 241, 245, 50 N.W. 983, 984, 35 Am. St. Rep. 304; State of Iowa v. Carr, 8 Cir., 191 F. 257, 261, 262; Nebraska v. Iowa, 143 U. S. 359, 361, 12 S. Ct. 396, 36 L. Ed. 186.

III. The further question remains whether the lands accreted to and detached from the plaintiffs' properties, or some substantial part of them, can be identified. Not only did the plaintiffs' witnesses testify that some of the lands were identifiable, but defendants' witnesses on cross-examination said that an area lying between dikes 691.6 and 691.6A, which were constructed on the Iowa side, was not washed away and is still clearly identifiable. Likewise the defendant admitted cutting cottonwood trees more than 18 inches in diameter in this area; and that such trees would require more than ten years growth to reach that size.

■ IV. All of these matters depend of course upon the

evidence before the trial court and which we now have for consideration, since the case is triable de novo. We agree with the trial court in its findings. The witness Jacob Rand said that the plaintiffs or their predecessors in title actually cultivated land almost at the extreme southerly end of the toe of the Bend in the early 1930s. The Rands were familiar with the lands and the river for many years; their testimony, so far as we can judge by the printed page, has the appearance of truth. There are many maps in evidence, and considerable testimony was given by engineer experts. We think none of these successfully contradicts the apparent good faith and clear-cut testimony of the plaintiffs' witnesses, who spoke from firsthand knowledge of the situation as it developed over the years. Some of them seem to corroborate it. Not only did the witnesses for the plaintiffs point out portions of the accreted land still in existence and identifiable, but Roland R. Walton, a civilian employee of the United States Corps of Army Engineers, said that the maps show the same situation and he identified from them some of the land in question as still in existence.

V. It would serve no good purpose to set out further details of the evidence. There is of course some contradiction of plaintiffs' cases as made by the testimony of the witnesses and the maps. But the trial court was of the opinion that the weight of the evidence was with the plaintiffs; and we are mindful of the well-established rule that in equity appeals we give weight to the fact findings of the trial court when the credibility of the witnesses and of their testimony is a factor. We follow this rule here; in fact, it seems peculiarly a case in which we should do so. What is termed the record before us has been made up with no regard for Rule of Civil Procedure 340. The entire testimony is set out in question and answer, apparently exactly as it appears in the transcript. We said in Brown v. Schmitz, 237 Iowa 418, 419, 22 N.W.2d 340, 341:

"Rule 340, Rules of Civil Procedure, contemplates that the record upon appeal shall consist of a summarized and abridged statement of so much of the record in the trial court as is material to the appeal. Testimony should appear in narrative form unless it is deemed of particular importance that it be shown by question and answer."

The record, if it be such, could have been shortened by two thirds to three fourths by attention to the simple rule set out above. Much of the matter injected by the question-and-answer procedure followed here is immaterial to any issue in the case, and the material parts could have been much condensed. The labor involved in a review of such a record has been greatly increased. Moreover, there is no certificate of the trial judge settling the record, and we were advised in oral argument of the case that it has never been presented to the trial court for that purpose. Whether the long 441-page document now before us is entitled to be considered as the record at all, whether we have in fact anything before us, is a serious question. One of the purposes of requiring a certificate of the trial court is that we may know the record as presented is in fact a fair abstract of the proceedings in the case. We have no such knowledge here. There is no stipulation of the opposing parties that this is the true record; in fact the appellees have protested the procedure adopted both by motion to dismiss the appeal and by argument here.

We have undertaken the difficult task of winnowing out the wheat from the chaff as a matter of grace and have arrived at the conclusion that the trial court's findings of fact and its decree and judgment are in all respects supported by the record as presented.

VI. The defendants call attention to the provision of section 3 of the Iowa-Nebraska Boundary Compromise, supra, which stipulates that titles good in Nebraska shall be good in Iowa as to any lands Nebraska may cede to Iowa by the agreement. Assuming that the lands in question were ceded by Nebraska to Iowa by the Compromise, we find nothing in this which affects private titles. Jurisdiction over the lands for governmental purposes was transferred to Iowa; but no attempt was made to determine ownership as between rival claimants, no matter where their residences may be. Nor did the court in any way attempt to preclude the State of Iowa from claiming lands lying below the ordinary high-water mark of the river. Its rights are not involved.

The decree of the trial court in the consolidated cases was

correct, and it is in all respects affirmed and title is quieted in the plaintiffs as therein adjudged.—Affirmed.

All JUSTICES concur.