**Ned TYSON et al., Appellants,**

v.

**STATE OF IOWA et al., Appellees.**

**John SCHROEDER et al., Appellants,**

v.

**Ned TYSON et al., Appellees.**

**Nos. 16460, 16464.**

United States Court of Appeals
Eighth Circuit.
Nov. 16, 1960.

Philip J. Willson, Council Bluffs, Iowa, Raymond A. Smith, Council Bluffs, Iowa, and Philip O'Hanlon, Blair, Neb., on the brief, for appellants Ned Tyson, Harry Tyson, Viggo Anderson and Birdie Anderson.

William L. Walker, Lincoln, Neb., and Roy M. Harrop, Omaha, Neb., Earl Ludlam, Lincoln, Neb., on the brief, for appellants John Schroeder, Roy M. Harrop, Homestead Corp., Jay P. Gibbs and G. Burton Kelly.

Michael Murray, Logan, Iowa, Norman A. Erbe, Atty. Gen. of Iowa, and James H. Gritton, Asst. Atty. Gen. of Iowa, on the brief, for appellees.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and REGISTER, District Judge.

VAN OOSTERHOUT, Circuit Judge.

United States of America brought this condemnation action, pursuant to constitutional and statutory authority, to acquire 242.83 acres of specifically described land located in Harrison County, Iowa, for the purpose of stabilizing the channel of the Missouri River. A declaration of taking was filed and $12,680, the estimated just compensation, was deposited in the registry of the court. The government has taken possession of the land.

Numerous claimants of title to the land were made defendants. No one has contested the government's right to condemn the land. There being conflicting claims of ownership, pursuant to court order, a separate trial was conducted before the court without a jury on the issue of the ownership of the condemned land, reserving the question of just compensation for later determination.

The land here involved borders on the Missouri River. The title problems are created by the shifting of the course of the Missouri River. Fact issues are presented as to whether the land of the original record title holders was completely washed away and destroyed and as to where the new land formed and as to what land the accretions attached.

The court, after hearing the evidence of all parties upon the title and ownership issues, filed a comprehensive and well considered opinion, not officially reported, incorporating its findings of fact and conclusions of law and determining that the State of Iowa is the owner of all the land in controversy and that none of the other claimants had any title to or interest in the land. After finding, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., that no just reason for delay existed, the court directed entry of final judgment denying the claims of all defendants other than the State of Iowa.

■■ The trial court acquired jurisdiction pursuant to 28 U.S.C.A. § 1345 because the action was commenced by the Government. An appeal lies from the judgment by the parties whose claims were rejected and denied because the judgment is made final as to them, as provided by Rule 54(b).

Separate, timely appeals from the judgment were filed by the following claimants:

1. Ned Tyson, Harry Tyson, Viggo Anderson and Birdie Anderson, who for convenience will hereinafter be called the Tyson claimants.

2. John Schroeder, Roy M. Harrop, Homestead Corporation, Jay P. Gibbs and G. Burton Kelly, who will hereinafter be called the Harrop claimants.

W. W. Freeland apparently claims part of this land as an accretion to riparian lands owned by him, but we find no record of any notice of appeal filed by him, nor was any brief filed in his behalf. We therefore give Freeland's claim no consideration.

The Tyson claimants have established ownership of lands in Nebraska on the Nebraska bank of the Missouri River and claim all the land here in controversy as accretions to such land.

The Harrop claimants assert that they are record owners of title to specified portions of the land in controversy based on the fact that the legal description contained in their record title coincides with the government survey lines as to part of the land in controversy. For the purposes of this case, we assume that the Harrop claimants have established title to the land the legal descriptions of which fall within the original government survey lines relating to the land here in controversy.[1]

The State of Iowa claims that all of the land in controversy developed in the form of islands that arose in the bed of the Missouri River, commencing about 1946, and accretions attaching thereto. The court upheld this contention and declared the State of Iowa to be the owner of all the land.

The Harrop claims to various portions of the land do not conflict with each other, but are adverse to the Tyson and State of Iowa claims. The Tyson claims are adverse to the Harrop claims and to the State's claim.

■ Our first problem is to determine what law controls. Since this is not a diversity of citizenship action, the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, does not apply. United States v. Standard Oil Co., 332 U.S. 301, 307, 67 S.Ct. 1604, 91 L.Ed. 2067.

In cases arising under federal law, in some situations federal courts have determined the rights of the parties upon the basis of state law. At pages 308 and 309 of 332 U.S., at page 1608 of 67 S.Ct. of the Standard Oil case, supra, the court states:

"It is true, of course, that in many situations, and apart from any sup-

---

1. Gibbs and Kelly claim under record title. The other Harrop claimants base their rights upon asserted tax titles alleged to have been obtained through tax deeds from Harrison County, Iowa. The court found the tax titles to be invalid. Inasmuch as we agree with the trial court's finding that all of the Harrop claimants' lands were destroyed and washed away, we do not reach the question of the validity of the tax titles.

posed influence of the Erie decision, rights, interests and legal relations of the United States are determined by application of state law, where Congress has not acted specifically. 'In our choice of the applicable federal rule we have occasionally selected state law.' Clearfield Trust Co. v. United States, 318 U.S. at 367, 63 S.Ct. 573, at page 575, 87 L.Ed. 838. The Government, for instance, may place itself in a position where its rights necessarily are determinable by state law, as when it purchases real estate from one whose title is invalid by that law in relation to another's claim. Cf. United States v. Fox, 94 U.S. 315, 24 L.Ed. 192. In other situations it may fairly be taken that Congress has consented to application of state law, when acting partially in relation to federal interests and functions, through failure to make other provision concerning matters ordinarily so governed. And in still others state law may furnish convenient solutions in no way inconsistent with adequate protection of the federal interest."

In City of St. Louis v. Rutz, 138 U.S. 226, 242, 11 S.Ct. 337, 343, 34 L.Ed. 941:

"The question as to whether the fee of the plaintiff, as a riparian proprietor on the Mississippi River, extends to the middle thread of the stream, or only to the water's edge, is a question in regard to a rule of property, which is governed by the local law of Illinois."

and at page 250 of 138 U.S., at page 346 of 11 S.Ct., we find:

"The title to land acquired by accretion is a title acquired under the operation of the law of the state, which each state determines for itself."

See also State of Arkansas v. Tennessee, 246 U.S. 158, 175–176, 38 S.Ct. 301, 62 L.Ed. 638.

[4] The Government has taken no part in the title dispute. It is ready and willing to pay just compensation to the party determined to be the rightful owner of the land it is condemning. No controversy exists as to the right to condemn. Under such circumstances, we believe that the ownership of the land should be determined by the law of the state in which the land is situated.

The Missouri River originally served as the boundary line between Iowa and Nebraska. The river constantly changed its course, thus shifting and varying the state boundary, placing land that was in one state in the other state, thus creating troublesome problems of jurisdiction and taxation. A commission was appointed by the States of Iowa and Nebraska to attempt to work out a permanent solution to the common boundary problem. As a result, in 1943 a compact was entered into between the States of Iowa and Nebraska, and approved by Congress,[2] which fixed and specifically designated the permanent boundary line between the states.

Such boundary was fixed at the center line of the proposed stabilized channel of the Missouri River, as shown by certain designated maps and plats on file in the office of the United States Engineers at Omaha, Nebraska, and elsewhere.

In 1943 when the permanent boundary was established, the river at the point here in controversy flowed approximately in the designed channel specified in the compact. Shortly thereafter the river commenced a gradual movement to the south and east, shifting back and forth to some extent, moving to a maximum extent of approximately a half mile. Such movement of the river resulted in gradually destroying and completely washing away all previously existing land in the area here involved and in the building up of new land by accretion. It is undisputed that all the land involved in this action is located within the boundaries of the State of Iowa as fixed by the compact.

2. Iowa Code Ann., Vol. I, p. 85; Iowa Acts 1943 (50 G.A.) Ch. 306; Nebraska

Laws 1943, Ch. 130; Act July 12, 1943, 57 U.S.Stat. at Large, 494.

The Iowa law applicable to the Harrop claims is reviewed and fully set out by the Supreme Court of Iowa in the recent case of Wilcox v. Pinney, 250 Iowa 1378, 98 N.W.2d 720, 723, the court stating:

"Right or wrong, it is well established that lands of a riparian owner are as subject to being lost by the gradual process of erosion by the river as they are of being added to by the process of accretion. We said in Payne v. Hall, 192 Iowa 780, 783, 185 N.W. 912, 914: 'Where the lands of a riparian owner are removed by the gradual process of erosion by the river, the land being no longer capable of identification, but having been carried away entirely, and the river occupies the identical space formerly occupied by the lands of the riparian owner, the title to the land so occupied by the bed of the river passes from the owner of the land to the state.' We reaffirmed this pronouncement in Rupp v. Kirk, 231 Iowa 1387, 1397, 4 N.W.2d 264, a case similar to the one at bar, and in Solomon v. Sioux City, 243 Iowa 634, 638, 51 N.W.2d 472."

The trial court made the following findings:

"In the years 1946, 1947 and 1948, the Missouri River left its designed channel and gradually moved in a southeasterly direction, thereby completely washing away and destroying the tract of land in question.

"The said movement of the river was not in the nature of a flood, but was rather a gradual movement with the water occupying the bed of the river sufficiently long and continuously to wrest it from vegetation and destroy its value for agricultural purposes."

A careful examination of the record before us satisfies us that the trial court's findings just set out are supported by substantial evidence. In oral argument counsel did not seriously contend otherwise. The Harrop claimants have failed to demonstrate that the court's findings are clearly erroneous.

The Harrop claimants further argue that a presumption of ownership arises from their record title to the land. The answer to this contention is that any presumption of ownership is completely overcome by the finding that the land was completely destroyed and washed away. Wilcox v. Pinney, supra.

Some contention is made that the State's title to the river bed is confined to the bed as it existed at the time of the compact. There is no support for such contention. The quotation from the Wilcox case, supra, clearly establishes that under Iowa law when the river moves over an owner's land and gradually destroys it completely, the title to the shifting river bed passes from the owner of the land to the State.

The court correctly determined that the Harrop claimants had no title or interest in the land in controversy.

We now consider the appeal of the Tyson claimants. The legal basis of the rights of each such claimant is the same. Each owned riparian land on the Nebraska bank of the Missouri River as it existed at the time of the 1943 boundary compact. The Tysons urge that as the river gradually moved southeastward into Iowa, the land here involved formed as accretions to their riparian land.

The Tyson claimants as their first point for reversal state: "The court erred in finding that when the land in controversy reached the high-water mark it was an island rather than accretion to the Nebraska bank."

We shall consider the Iowa law applicable to the Tyson claims before considering the facts. The legal principles to be applied are fully and accurately set out in the trial court's opinion and are not seriously challenged.

It is conceded that the Missouri River is a navigable stream. It is well established under Iowa law that riparian owners along the bank of a navigable stream hold title to the land only to the high-water mark and that ownership of the river bed from the high-water mark to the thread of the stream is

in the State. Rand v. Miller, 250 Iowa 699, 95 N.W.2d 916, 918; Payne v. Hall, 192 Iowa 780, 185 N.W. 912, 914; Holman v. Hodges, 112 Iowa 714, 84 N.W. 950, 951, 58 L.R.A. 673. "High-water mark" is defined in Wilcox v. Pinney, supra, as follows:

" 'High-water mark' has a definite meaning in our law. It is co-ordinate with the limit of the bed of the water, and that, only, is to be considered the bed which the water occupies sufficiently long and continuously to wrest it from vegetation, and destroy its value for agricultural purposes." 98 N.W.2d 720, 723.

 Where both banks of a navigable stream are located within the boundaries of a state, the entire bed of the stream belongs to the state. Bennett v. National Starch Mfg. Co., 103 Iowa 207, 72 N.W. 507; Musser v. Hershey, 42 Iowa 356, 361. Since it is undisputed that all of the land here involved and both banks of the river are within the State of Iowa, it follows that the State is the owner of the entire bed of the river.

Tysons call attention to the case of Payne v. Hall, 192 Iowa 780, 185 N.W. 912, 914, and particularly to the quotation therein contained from McBride v. Steinweden, 72 Kan. 508, 83 P. 822, which sets out various criteria for determining when an island has been formed, such as that an island must be permanent in character and permanently surrounded by a channel of the river. The quotation also contains the statement reading: "Whether the formation in the river was a sand bar or an island was a question of fact, and was fairly presented to the jury."

The Iowa court in the Payne case did not expressly adopt the criteria in the Kansas case quoted. In the body of the Payne opinion, the court states:

"It is also the law that, where an island is formed in the channel of a navigable river, whether the same be over the original river bed or over a new bed formed by the erosion of the banks of the river, that such island so formed in the channel of the river becomes the property of the state. The island is regarded as in the nature of an accretion to the bed of the river and belongs to the state the same as the river bed itself."

At page 915 of 185 N.W. the court defines an island as "a body of land entirely surrounded by water." A like definition is found in 56 Am.Jur., Waters § 504, p. 911.

The question of what constitutes an island is quite fully considered in Holman v. Hodges, supra. Many decisions dealing with the island situation are cited and quoted, some with approval. There the court found that the bar or island rested upon the river bed which belonged to the state and that the formation of the island had been entirely distinct from the accretions to the mainland. The court there states:

"It is enough for the purposes of this case that the land beyond the channel last mentioned was formed independently of plaintiffs' land. It then never became a part of their lots through the process of accretion or reliction."

" * * * As this island, then, was formed on the bottom of the river, connected in no way with the shores, it would seem that title continued in the state. It rests on soil which, when beneath the surface of the water, belonged to the state, and, if no longer its property, when was the title devested?" 84 N.W. 951, 952.

In the Wilcox case, supra, the state apparently was not made a party. The court cites and distinguishes the factual situation in the Holman case from that which it is considering. In the Rand case, supra, the court observes:

"Nor did the court in any way attempt to preclude the State of Iowa from claiming lands lying below the ordinary high-water mark of the river. Its rights are not involved." 95 N.W.2d 920.

We believe that the question of whether an independent island arose in the bed of the stream presents a fact issue to be determined after the fair consideration of all the relevant evidence. The question of whether accretions formed to the island or the mainland also presents a fact question. We find nothing in the trial court's opinion to indicate that its judgment was in any respect induced by any erroneous view of the Iowa law.

 In Iowa, equity cases upon appeal are triable de novo. Wilcox v. Pinney, supra. Thus the Iowa court is not bound by the substantial evidence standard but is free to place its own evaluation upon the evidence and reach a result contrary to the trial court, even if substantial evidentiary support exists for the trial court's findings. Accordingly a reversal of the trial court's fact findings does not necessarily imply that such findings are not supported by substantial evidence.

 We are bound by Rule 52(a) of the Federal Rules of Civil Procedure and can upset fact findings only when they are not supported by substantial evidence. United States v. United States Gypsum Co., 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746; Sachs v. Commissioner, 8 Cir., 277 F.2d 879, 881; Pendergrass v. New York Life Ins. Co., 8 Cir., 181 F.2d 136, 137. If substantial evidence exists to support the trial court's findings, we cannot substitute our judgment for that of the trial court.

 The trial court specifically found:

"Sometime in 1947 or 1948 two small sand bars appeared in the river with water flooding between said sand bars and the Nebraska shore, and also water flowing between said sand bars and the Iowa shore.

"Vegetation, probably small willows and cotton trees, started growing on said sand bars in about 1948, at which time said sand bars by a process of accretion, became two islands of land above the ordinary high-water mark of the river.

"In 1948, as the result of repairs being made on the pile dikes in the area, the main channel of the river was moved back into its designed channel, but the two islands remained above the ordinary high-water mark.

"In the spring of 1949 the main channel of the river moved out of its designed channel and the river flowed in two channels, one on each side of said islands.

\*　　\*　　\*　　\*　　\*　　\*

"The land being condemned herein is all accretion land to the island above mentioned, and is not accretion land to the Nebraska shore."

The question presented for our determination is whether the foregoing findings are supported by substantial evidence. At the trial in 1959 various witnesses on behalf of each party testified as to their recollection as to the island formation, the river conditions and the accretion situation, much of said testimony relating to observations made ten or more years before the trial. Much of this testimony is rather indefinite, both as to time and description. It is undisputed that many shifts occurred in the river during this period.

Many exhibits in the form of plats, charts, and ground and aerial photographs, covering various periods of time, were introduced. Witnesses used such exhibits as an aid to their testimony, pointing "here" or "there", with no record preserved as to the spot indicated. Thus, in addition to seeing the witnesses and being better able to determine their credibility, the court was placed in a more favorable position to intelligently use and interpret the exhibits.

The evidence as to whether islands arose in the river channel and the accretions attached to them, or whether the accretions were to the land of the Tyson claimants on the Nebraska shore, is in sharp conflict. While there is evidence to support the Tyson contentions, we cannot say that the court's finding as to the independent formation of the island and the accretions thereto is without substan-

tial evidentiary support. The state's witness Jauron, a conservation officer, claimed a close familiarity with the territory in controversy for the period from 1946 on, and definitely stated that the islands formed in the river at the point where the present land is located and that there was a definite channel between the islands and the Nebraska shore, and that such situation continued until at least the 1952 flood. He testified that he traveled between the islands and the Nebraska shore in a boat in 1946, 1948 and 1950. He also stated that in the fall of 1948 the engineers placed the river back in the designed channel and at that time the main channel flowed between the island and the Nebraska shore, and that such condition continued until sometime in 1949 when the river again worked to the southeast. The government engineer, Mr. Huber, corroborated the testimony that the river was put back in the designed channel in 1948.

Some but not all of the photographic exhibits show the islands surrounded by water in the pre-1950 period. After the big 1952 flood, the island was no longer continually surrounded by water. Physical evidence of what is claimed to be the old channel some 150 feet wide, lying between this land and that of the Tyson claimants, still exists.

The physical facts reported by Jauron and Thomas, an engineer, who scientifically determined and testified as to the high and low spots on the land in controversy, and the size and location of trees growing thereon, lend considerable support to the court's findings. The high points on the land were near the center of the island, running from east to west, and the high spots were the approximate location of the larger trees. There is testimony that the trees were much smaller in the vicinity of the Tyson land. Tyson's own evidence is that the trees that he cut when clearing part of the land were much smaller. The land at the high point was not stratified, while the bottom of the old channel was highly stratified.

The trees cut near the high spots in 1959 ran up to twelve inches in diameter, and showed eight annual rings, and two other rings that might be false rings. Jauron claims an aerial photograph of the island taken in 1949 shows vegetation thereon. Engineer Huber is uncertain as to whether the photograph shows vegetation. There is evidence that vegetation does not usually appear on a sand bar until it has been in existence for several years.

Mr. Huber, of the Army Engineer Corps, testified that the fluctuations in the water level of the Missouri River have decreased considerably since the flood control dams were placed in operation, commencing in 1952. The normal stage of the river since 1952 has been about eight feet. Prior to the dam construction, the water level varied from a winter low of five feet, to a spring high water stage of fifteen to sixteen feet. The government control and regulation of the water level may have been a contributing factor to the discontinuance of the flow of water around the island and may have brought about a lowering of the normal high-water level in the river.

No benefit would result in discussing the conflicting evidence in greater detail. A careful study of all the evidence satisfies us that the court's finding to the effect that the islands formed independently in the channel and that subsequent accretions attached to such islands, is supported by substantial evidence. Such findings as heretofore set out support the judgment dismissing the Tyson claims.

Tysons additionally contend that the State of Iowa owns only the east half of the river bed and that there is no evidence or finding that the islands arose on the east half of the river bed, and that consequently the court erred in concluding that the State is the owner of the islands. This contention lacks merit. The court in its opinion actually states that the islands formed on the Iowa or east side of the channel. Moreover, the entire river bed is located in Iowa and that the state owns the entire river bed at the point in controversy. In

a compact boundary situation, the general rule established in State of Nebraska v. State of Iowa, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186, that the thread of the stream is the boundary, does not apply. State of New Mexico v. State of Texas, 275 U.S. 279, 301, 48 S.Ct. 126, 72 L.Ed. 280.

 Lastly, Tysons claim the court erred in stating the Nebraska land owners could acquire no accretion rights to their banks across the fixed state boundary. We have considerable doubt whether the court intended by such statement to say more than that Iowa law controls since all the land in controversy is located in Iowa,[3] and that the Nebraska law of accretion did not operate to create riparian rights within the territorial limits of Iowa. So limited, the court's view would coincide with our view of the law. If the court intended its statement to have any broader implications, it is our view that the statement was made only as an alternate or an additional basis for supporting the result reached by the court and that the court had already decided the case on the basis discussed earlier in this opinion.

We have held that the court's judgment is entitled to be affirmed upon the basis of the court's determination that the origin of the land in controversy was independent islands formed in the bed of the Missouri River, belonging to the State of Iowa and that the additional land formed as an accretion to such island. Such determination is decisive of these appeals. Accordingly, we do not reach and need not consider the alternate basis for affirmance here under attack.

The judgment appealed from is affirmed.

3. Both Iowa and Nebraska recognize the right of a riparian owner to accretions forming against his river bank. However, in Nebraska, unlike Iowa, the riparian owner in the state owns the river bed to the thread of the stream. Thies v. Platte Valley Public Power & Irr. Dist., 137 Neb. 344, 289 N.W. 386, 387. Such difference in law distinctly affects ownership of islands forming in the river bed. The trial court's opinion is apparently based on City of St. Louis v. Rutz, 138

U.S. 226, 11 S.Ct. 337, 34 L.Ed. 941. In that case a number of reasons are assigned by the court for the result reached, among them that the City of St. Louis could acquire no rights to an island formed on the Illinois side of the river channel since under Illinois law the riparian ownership extends to the center of the stream entitling the Illinois owner to islands formed upon his portion of the river bed.